FLETCHER *v.* CHERRY.

4-7459                              182 S. W. 2d 211

Opinion delivered July 10, 1944.

*Guy E. Williams,* Attorney General, *Cleveland Holland,* Assistant Attorney General, *Rose, Loughborough, Dobyns & House* and *Baucum Fulkerson,* for appellant.

*Osborne W. Garvin* and *E. Chas. Eichenbaum,* for appellee.

GRIFFIN SMITH, Chief Justice. An appropriation in Act 311 of 1943 made $200,000 available ". . . for repairs to existing buildings at the Benton site of the State Hospital."

Necessity for substantial expenditures to recondition most of thirteen buildings comprising what is termed the original unit was predicated upon personal observations by members of the Board of Control, and upon detailed reports by Donald Leveck, a contractor whose ability was stipulated in the instant suit.

The buildings were begun in 1931 and completed a year later, but were not put into general use until the winter of 1936-1937. William Peterson was contractor. Lack of funds prevented installation of a central heating plant, but this facility was supplied subsequent to 1935, when an additional unit embracing thirteen buildings was added. Following completion of the first unit heavy damage occurred, much of which was due to non-use.

With Leveck's written report as a basis the Board successfully appealed to the Legislature for funds. A condition of the appropriation is that "Contracts let under the provisions of this Act shall be let to the lowest responsible bidder."

In response to advertisements eight bids were submitted, the highest being $189,012.51. Lowest was that of William Peterson and D. J. MacFadyen (partners)— $161,923.21. Second lowest bid was by G. W. May Construction Company—$162,745.54. The Board rejected Peterson & MacFadyen's offer and accepted the May proposal to do the work for $822.23 more than the Peterson & MacFadyen bid. The latter successfully applied to Chancery Court for an injunction, alleging that the Board was about to proceed illegally.

The question is, Was it mandatory that the Board look only to the face of the bids and to financial responsibility of the bidders, or is the term "responsible" broad enough to confer discretion?

American and English Annotated Cases, 1913A, p. 497, emphasizes the opinion in *Williams* v. *City of Topeka et al.,* 85 Kas. 857, 118 Pac. 864, 38 L. R. A., N. S., 672, where it is said that the phrase "lowest responsible bidder in a statute providing for competitive bids before awarding contracts for certain public improvements im-

plies skill, judgment and integrity necessary to a faithful performance of the contract, as well as sufficient financial resources and ability.''

A scope note (page 500) is to the effect that the Williams case is in harmony with authorities, ''. . . the rule being well settled that where a statute requires municipal contracts to be let to the 'lowest responsible bidder' the duty of the officer letting the contract is not merely ministerial, but partakes of a judicial character, requiring the exercise of discretion.''

In *People ex rel. Assyrian Asphalt Co.* v. *Kent,* 160 Ill. 655, 43 N. E. 760, it is said that provisions for a bond, with securities financially able and bound to respond in damages for failure on the part of a contractor was not, alone, necessarily sufficient, for ''. . . a recovery of damages, aside from the expense incident to the suit, is never full compensation for the incidental damages, the injuries and annoyances resulting from incompetency or inefficiency.'' It was then said: ''. . . the added requirement that the bidder shall be responsible has a broader meaning than the mere financial ability to respond in damages.''

The Supreme Court of Maryland (*Madison* v. *Board of Baltimore City,* 76 Md. 395, 25 Atl. 337) went so far as to say that discretion of commissioners would not be reviewed ''. . . unless it can be shown that such public officers have been guilty of fraud in the exercise of their discretion.''

In *Street Improvement District* v. *Crockett,* 181 Ark. 869, 28 S. W. 2d 331, it was said: ''Everything else being equal, . . . the spirit, if not the latter, of the law, would require that the Board let the contract to the lowest bidder. But when, as here, everything else is not equal—when there are other important elements to be considered in connection with the amount of the bid—we think the statute vests in the Board the power as well as the duty of determining which of the bidders will best accommodate the purposes of the District. This necessity involves judgment and discretion, and the courts will not

substitute their judgment for that of the Board when **a** mere matter of discretion is involved.''

It is not necessary to cite other authorities in support of the rule that a public board, operating under a statute such as Act 311, has discretion. The point is admitted by appellees; but, it is insisted, the Board abused its discretion and therefore should be coerced by the courts.

Facts do not sustain this assertion. On the contrary, we do not hesitate to say that if the Board, acting reasonably, sincerely believed the low bidders would discharge the new contract as indifferently as it was thought William Peterson acted in 1931 and 1932, employment of the firm might have been an abuse of discretion.

Frank J. Ginocchio, architect, in a letter addressed to the Board July 27, 1943, said: ''We found that most of the trouble has been caused by leaks coming from the stone coping, leaks coming from exterior walls, and in a good many places leaks coming from defective flashings.'' Testifying in the case at bar he asserted:

''We noticed a lot of separation cracks we call fissures. That permits the passage of water between the brick and the wall, and into the wall. . . . Ordinarily I would say that the condition I found at Benton was not indicative of skillful and good workmanship. . . . I found on the exterior masonry walls 'worlds' of hollow joints. . . . I found them in all the original thirteen buildings. . . . The second unit of thirteen buildings was built by Wohlfeld of Dallas. . . . There was very little trouble with hollow joints in the buildings which were constructed by Wohlfeld.''

Other witnesses testified to similar observations.

Dr. George B. Fletcher, Chairman of the Board, said: ''Frankly, we thought that, due to the small difference between the low and the next low bidder, that we would prefer to have some one else do the job, rather than the man who [erected the structures] in the first

place. In our opinion they had not stood up. That was the way we arrived at our decision. . . . We went all over the tops of the buildings. They were well designed. We did not have the specifications. . . . We saw the holes in the walls and found there were plenty of defects. Results were all that we were interested in."

Dr. A. C. Kolb, Superintendent, testified to facts that in his opinion justified the course taken. Substance was that the Board was endeavoring to secure the best results possible.

Against this is the fact that MacFadyen was not associated with Peterson when the construction was done; that the work was carefully inspected from day to day— almost from hour to hour—under scrutiny of a competent Board; that two severe windstorms and perhaps mild earthtremors had affected the walls; that Peterson and MacFadyen now have contracts amounting to millions of dollars and are able to execute bonds with reputable fidelity companies as sureties; that reputation of each member of the partnership is good, and that Peterson, in building the unit at Benton, followed plans and specifications.

We do not determine whether a preponderance of the evidence discloses that the contractors are or are not responsible; nor do we pass upon the weight of evidence offered upon the one hand to prove, and upon the other hand to disprove, that the work done by Peterson in 1931 and 1932 was defective. Repairs costing more than thirty thousand dollars have been made since the buildings were completed. It would be extremely difficult to say with assurance what the situation was when Peterson completed his task.

What we are convinced of is that the Board acted in good faith when it concluded that for a difference of slightly more than eight hundred dollars it should reject the Peterson & MacFadyen bid and assign the work to another, as to whom there was no imputation of carelessness, indifference, or studied avoidance as to quality of workmanship.

As trustees of the public fund, members of the Board were charged with a high degree of responsibility; and when they honestly believed, without carelessness or undue suspicion upon their part, that inferior results might characterize work done by an association which included one whose record was not satisfactory, it became the duty of these trustees to avoid what to them was an unnecessary risk.

Reversed, with directions to dissolve the injunction. Because of the public interest involved, the Clerk of this Court is directed to issue an immediate mandate.